MARILYN E. BEDNARSKI (SBN 105322)
KAYE, McLANE & BEDNARSKI
Attorneys at Law
128 North Fair Oaks Avenue, Ste. 100
Pasadena, California 91103
Telephone (626) 844-7660
Facsimile (626) 844-7670
mbednarski_kmb@earthlink.net

Attorneys for Defendant
RONALD P. WALLACE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 04-1376-CBM |
| Plaintiff, | SUPPLEMENTAL SENTENCING MEMORANDUM; EXHIBITS 6 to 16 |
| v. | |
| RONALD P. WALLACE, | Hearing Date: February 5, 2007 |
| Defendant. | Hearing Time: 10:00 a.m. |

    Ronald P. Wallace, by and through his counsel of record Marilyn E. Bednarski, hereby files this Supplemental Sentencing Memorandum adding to his position in earlier filings and the evidentiary hearing which began on October 30, 2006 and continues February 5, 2007. This filing includes Exhibits 6 through 11. Exhibits 12 through 16 are filed separately but concurrently to comport with electronic filing requirements.

Dated: January 30, 2007    Respectfully submitted,

By____/s/_____

Marilyn E. Bednarski
Attorney at Law

# I.

# SUMMARY OF POSITION

Mr. Wallace's medical condition is extreme, and it is not stable. He is currently undergoing bi-monthly intramuscular iron injections as well as B-12 injections with a hematologist Dr. Jaffrey. His condition has improved slightly but he is still "not out of the woods." Attached Exhibit 7, Dr. Miskovitz Declaration. Mr. Wallace's January 2007 blood test results compared to his October 2006 blood test results show that he has made slight progress in his iron levels, but not in B-12, and that his red blood cells remain very small. Id. at ¶3-6; and Exhibits 6 (Jan, 2007 results) and Exhibit 8 (October 2006 Results).

As this Court knows from its lengthy experience, court orders to the BOP are recommendations only, which may or may not be followed, so this Court cannot order specific treatment or even designate an institution. Despite the government's suggestions concerning care potentially or hypothetically available to Mr. Wallace, the BOP will guarantee nothing, for example, not a designation, not a medicine, not an experienced doctor and not administration of his regimen of medical treatment.

The evidence in the Exhibits, the testimony both taken and expected, demonstrate that within the BOP health care system, there is tremendous potential for delay, and insufficient care. Moreover, Mr. Wallace's actual experience when arrested and incarcerated on this case for thirty days in October 2004, resulted in reactivation of the disease which continues to cause extreme suffering to this day, including severe pain, internal bleeding, severe anemia, and nine inches of additional diseased intestine. Chris Kottenstette, the pain specialist will attend the hearing, and speak to the extraordinary daily pain Mr. Wallace suffers, and the high tech medicines necessary to control his pain and disease and to allow him to function as well as possible.

In addition to the other mitigating factors, Mr. Wallace is currently employed in a position from which he can make significant restitution over a five year period of

probation.  As evidence of his good faith, and ability to make restitution, he has been making regular deposits into a Restitution trust account of $2000 per month and can immediately pay the $38,000 he has saved as of January 16.  See attached December statement (which does not yet reflect the $2000 deposit from the last pay period).

## II.
## ARGUMENT REGARDING EXTREME HEALTH CONDITION

Mr. Wallace's dire health condition supports the admittedly large decrease in sentence from the advisory range under both §5H1.4 and §3553 for health.  A departure under section §5H1.4 involves a two-step process: "[T]he district court should first make a factual finding to decide whether [the defendant's] physical and mental disabilities constitute "an extraordinary physical impairment." United States v. Carey, 895 F.2d 318, 324 (7th Cir.1990).  If the court so finds, it should then consider whether the condition warrants a shorter prison term or an alternative to confinement.  Id.

**A.  Mr. Wallace's Condition is Extreme and The BOP Has Not Shown That it Will Properly Care For His Extremely Complex Condition.**

Even if the government had, which it did not, shown that the BOP could actually effectively care for Mr. Wallace, the BOP's ability to care for an inmate is only one factor in determining whether a condition is extraordinary.   In United States v. Jones, the district court judge in a firearms' possession case sentenced the defendant below the guidelines, finding that *not* returning defendant to prison would *better insure* continuing medical care or other correctional treatment in the most effective manner for this defendant who had a mental illness.  352 F.Supp. 2d 22 (D. Me. 2005).

It is manifest that Mr. Wallace's complex and extreme medical condition meets that standard.  First, there is no question that his physical condition is "exceptional,"

United States v. Koon, 518 U.S. 81, 95 (1996) and that he is "seriously infirm," within the meaning of U.S.S.G. § 5H1.4. His extreme medical condition is not only uncommon, there is no evidence at all that the BOP has ever treated anyone with nearly as extreme Crohn's condition. Cf., United States v. Fiovinette 91 F. Supp. 2d 814, 816 (E.D. Pa. 2000)(the evidence submitted showed that the defendant's medical conditions did *not* require exceptional medical treatment and specifically showed that the Bureau of Prison's *had* experience caring for inmates with *similar* health problems).

Here the Bureau does *not* have such experience. Indeed few medical doctors do. The record in this case shows that the doctors Miskovitz and Bochner are at the top of their gastroenterology field, and are uniquely qualified by training and experience to treat Mr. Wallace. Ron Wallace is in the top worst 1% of all Chron's sufferers and these doctors' collaboration with Dr. Niebur, pain specialist Kottenstette, and hematologist Dr. Jaffrey cannot be replicated in the BOP.

Dr. Pelton no basis to opine that any other patient in the BOP system had any condition "similar to Wallace's" (whose condition everyone agrees is complex and severe and in the worst 1%, compounded now by severe anemia, and multiple recent blood transfusions to replenish loss of blood. The stated basis for his unfounded conclusion was that there are two patients in the BOP system with Crohn's disease getting Remicade, one at Butner, and one at FMC Rochester. 119: 5-10. Another patient with arthritis was getting Remicade at FMC Rochester. RT 133: 5-7. When he opined that these other patients' conditions were similar to Mr. Wallace's it appears that he had reviewed a brief email about one patient, but had not reviewed their medical records. RT 132-133. There is no basis to conclude that either of these Crohn's patients had a history like Mr. Wallace: with his multiple surgeries, total parenteral nutrition at one point, failure to respond to conventional therapies and severe anemia. RT 10-11.

The evidence taken in this case shows that his condition is not an

easily-controllable medical condition.[1]  Dr. Pelton (the government's medical BOP expert) agrees that Mr. Wallace is in the worst 1% of all Crohn's sufferers and is likely to have further complications.  RT 122-123.  He is a "medical time bomb" per Dr. Miskovitz (RT 23) whose opinion is that "it is not medically safe to send Ron Wallace to custody without a commitment that he will get the defined, specific and demonstrated medical care and treatment he needs without delays or interruptions."  Attached Exhibit 7, at ¶9.

The BOP "system" of providing outside emergency care through the Mayo hospital three miles from FMC Rochester is not reassuring.  Dr. Miskovitz explains:

> "this system makes me fear for Ron's health and safety if incarcerated.  Even though I believe the Mayo clinic has GI doctors qualified to understand Ron's complex medical history and disease,  Ron needs prospective care, not responsive care like a fire department.  He needs regular monitored blood work and examinations by qualified persons in a doctor patient relationship with him.  In a prison setting where he is at risk of his medical complaints being ignored, and at risk of lapse or delay in effective and essential care, his health will be severely at risk."

Id. at 10-11.  Dr. Bochner also believes that "it definitely is not safe to deprive or remove Mr. Wallace from his medical therapy and has serious concern that he would

---

[1] Dr. Miskovitz and Dr. Bochner testified that his disease is not under control: specifically that he is severely iron and B-12 deficient; that he cannot be placed safely in a situation without guaranteed monitoring and quick access to emergency services; that he must have guaranteed access to the current regimen of drugs and medicine he is receiving; that  he is a medical time bomb; that a lot of potential things can go wrong with his disease and treatment; that it is essential that he receive medical attention by experienced "grey haired doctors" aware of his medical history; that he must be treated actively and pro-actively, not responsively; that he needs treatment without delay or interruption; that he could on any particular day develop a life threatening condition; and that currently severely iron and B-12 deficient, a condition that must be remedied so that he can produce his own red blood cells to replace blood loss; that he needs the iron and B-12 injections he is receiving from Dr. Jaffrey; that it is important that he receive a special diet, involving numerous small meals a day low in roughage, high in vitamins ; and that he is significantly more at risk than other inmates because his immuno-suppressant medications render him highly vulnerable to infection.

be placed in jeopardy if incarcerated." RT 63.

The government has presented evidence of the BOP health care system which theoretically could apply to Mr. Wallace. Assuming such resources or services were applied, the inference the government draws is that he would be adequately treated. But beneath the BOP's oft repeated phrase "that the BOP can adequately care for all inmates medical needs," is the underlying reality that the government gives this Court no commitments or guarantees of anything that is essential to Mr. Wallace's present, or long term, health.

The government will not commit to any of the following: 1) where he would be designated; 2) or if he were designated to FMC Rochester, if he would be in a dorm or hospital bed; 3) if there is any physician at FMC Rochester who has any experience with Crohn's disease (or as complex a case as he has); 4) how often he would see any physician; 5) how often he would see any medical personnel; 6) if he would in fact be on the schedule to be seen every two weeks at the FMC Rochester GI clinic staffed by Mayo doctors; 7) whether he would get intramuscular iron shots and B-12 shots such as those which are now part of his treatment regimen; 8) how often his blood would be drawn, and tested for relevant indicators of Crohn's related problems; 9) whether the lab results would be provided to Mr. Wallace; 10) whether the lab results would be reviewed by a physician knowledgeable about Crohn's disease and his history; 11) whether he would be given Remicade infusions; 12) whether he would get Imuran; 13) whether he would get Kadian; 14) whether he would get Actiq; 15) what the schedule of medications would be; 16) whether his medicines would be given on the present schedule without interruption; 17) whether any qualified physician would review his medicines and bloods regularly and determine any shift necessary in schedule or amount or medicines; 18) if a BOP or Mayo physician recommended a medicine outside the BOP National formulary (such as three of the four medicines he takes) would the request be granted; 19) whether the lack of medical care that occurred at Jefferson County in October 2004 would not

reoccur; 20) whether he would be taken to the Mayo ER if he complained of serious symptoms, for example severe abdominal cramping, severe bleeding etc.; 21) what treatment he would get at the bi-monthly GI clinic assuming he made it on the scheduled list of inmates; 22) whether at that clinic a Mayo fellow student would do the consult or an experienced GI physician; 23) whether his complete medical records would be reviewed by the staff physician at the FMC; 24) whether the staff physician would in fact ever consult with his team of physicians about his condition; 25) whether if he needed outside treatment at the Mayo there would be delay in transporting him to Mayo; or, 26) whether a person in the ER at Mayo would be knowledgeable about his condition and history or familiar with or have access to his medical records.

      The government's scepticism about his dire health seemed to have been fueled by a few selective and externally visible efforts by Mr. Wallace to lead as normal a life as possible. As Dr. Bochner testified, it is "not fair to say that he has led a normal life." RT 78-84. What is fair to say is that Mr. Wallace makes a tremendous effort to live the life he has, with some exercise (he golfed and skied on occasion sometime last year), and to travel for work and family. What is not fair is to diminish, or minimize the extremely debilitating symptoms and pain of the disease. Noone would choose to live like him, dosed up on extreme amounts of narcotics to simply get through a day, spending a significant number of days in bed every month-- too sick to get up, and missing significant time with his wife and children.

      Part of the treatment which the undersigned believes would not be given to Mr. Wallace is his high tech, expensive and very strong narcotics in the form of Kadian (time release morphine) and Actiq (morphine suckers for break through intense pain). Neither are on the National Formulary. Exhibit 9. At the hearing, his pain specialist Chris Kottenstette will explain the importance of the high tech time release pain medicine Kadian. The time release characteristic of this drug is essential because it keeps his morphine level at a constant level without the peaks and valleys of

traditional morphine pills.  This reduces the stress caused by extreme pain as well as slows his intestinal function enough so that he can absorb enough nutrients through his shortened intestines.  Mr. Kottenstette is expected to testify that on a scale of 1 to 10, some women have experienced childbirth as a 10, and that Mr. Wallace's disease at times a 10.

It is expected that Dr. Pelton will agree that the BOP prefers to "wean" inmates from narcotics.  It is documented that the BOP gives Motrin in circumstances of extraordinary pain where on the outside, a patient would get a much more effective pain reliever.  The BOP gave Dr. Murphy aspirin when he complained of the pain which he suffered [from Crohn's].  RT 139-141.  Similarly an end stage cancer patient in his final days at FMC Springfield, whose could no longer use his extremities, was given Motrin as his primary pain medication.  Exhibit 11, at page 16, fn. 12, GAO Report on "BOP Inmate Access to Health Care Limited By Lack of Clinical Staff," GAO/HEHS-94-36 BOP (1994).

This same GAO report criticized the BOP's care for not giving chronically ill patients all the care they needed at the three facilities examined.  Exhibit 11, page 2, 9-10.  This finding is consistent with examples from witnesses in this case concerning the lack of good treatment in the BOP on two specific occasions involving inmates with GI problems.  Dr. Miskovitz testified that he had a patient with Diverticulitis (a chronic bowel disease) who was incarcerated at FMC Rochester in the early 1990's who did *not* receive stellar care, who got poor food despite diet being an management tool for the disease and who had faced barriers to access to appropriate doctors.  RT 47-48.  Another witness, Dr. Murphy, was an inmate at FMC Rochester in the 1990's and despite his complaints, months went by before he was finally seen by doctors outside the BOP and diagnosed with Crohn's disease, only after months of treatment by BOP doctors for his discomfort and weight loss with milk (which exacerbates the disease).  In addition, despite the Mayo doctor's recommendation for treatment of his Crohn's with Imuran, he was returned to the

BOP, and *not* given Imuran but Sulfasalazone, and without medically indicated supplements and dietary changes. RT 141-144, 152-154; RT 89-93.

**B.    The Evidence Shows the Long Lasting and Possibly Permanent Damage To Mr. Wallace's Health From Lapse Of Care While Incarcerated.**

In this case there is concrete evidence of the damage that can result from a lapse in medical care and medications. When Mr. Wallace was incarcerated in October 2004, his lapse of care and medications caused a severe flare up of his disease, a condition which to this day has lasting effect. Dr. Bochner testimony (RT 61: 8) and Exhibit 7 at ¶8 (Dr. Miskovitz' declaration). His internal bleeding and nine inches of diseased intestine could well be the result of his incarceration without administration of necessary medications such as Remicade, Actiq and Kadian, and Imuran only after a 2 weeks lapse. Id. Mr. Wallace lost 30 pounds in thirty days, and is still bleeding. His severe anemia, low iron, low B-12 and inability to produce enough healthy red blood cells on his own now are resultant. Id. He has only incrementally improved in iron levels despite the last three months of intramuscular iron shots. Exhibit 7. His B-12 levels are still as dangerously low. Id. His inability to absorb iron and make healthy red blood cells puts him at risk of stroke, and heart disease (Id.) as well as extreme weakness (RT 76-78). These are some of the several penalties he has already suffered as a result the arrest and prosecution in this case.

His medical condition will require careful attention over these next months. Dr. Bochner has stated: "If Ron's clinical course does not improve over the next several months we will probably have to adjust his therapy further. And there is a couple of ways we can do that. One would be to increase the dose of Remicade. The other would be to go to another biologic agent. There are some other therapies that are similar as antibiologics, but they aren't approved by the FDA for use, nonetheless there is very good evidence that they are effective and it is allowable for us to go ahead and use those therapies when somebody is failing Remicade." RT 64-65.

**C.      Another Factor Supporting A Non-Prison Sentence is His Extreme Vulnerability to Infection**

Another factor supporting the finding of extraordinary physical impairment is that the necessary medicines Mr. Wallace must take in an effort to control his disease make him extremely vulnerable to opportunistic infection.  See United States v. Martinez Guerro, 987 F. 2d 618, 621 (9th Cir. 1993)(district court's downward departure under §5H1.4 affirmed on grounds that "an extraordinary physical impairment that results in extreme vulnerability is a legitimate basis for departure"), citing United States v. Long, 977 F.2d 1264 (8th Cir.1992); United States v. Lara, 905 F.2d 599, 603-05 (2d Cir.1990) (district court's downward departure affirmed based on the defendant's "potential for victimization").

The doctors agree that the medicines are immune suppressant medicines.  This means that Mr. Wallace does not have the ability to fight off infection; he is much more susceptible to infection, such as TB.  RT 67-68.  In addition to Mr. Wallace being immune suppressed, he has even a greater susceptibility to TB because of the medicines.   With Mr. Wallace being immune compromised and because Remicade is associated with activation of latent TB infection, he will have a much worse course if he acquires TB.  RT 69.  This risk is so significant that it is noted on the Remicade label.  RT 68.

The government suggested on the cross-examination of Dr. Bochner (RT 84-88) that TB is not a significant concern in the BOP, a suggestion belied by documented studies.  As the population as doubled from 1993 to 2003 so has the number of cases of TB identified by the study published in American Journal of Public Health in 2005. Exhibit 10, at page 5 of 10, "An Unanswered Health Disparity: Tuberculosis Among Correctional Inmates, 1993 through 2003," Am J. Public Health, 2005 95 (10) 1800-1805, posted on the internet at www.medscape.com/viewarticle/516102.  The study shows that the TB rate in Federal prisons is higher than in state facilities and is almost 6 times as high as the

non incarcerated population. Exhibit 10 at pages 3-5. Further inmates are less likely to complete a course of treatment than the non-incarcerated population. The article notes that tuberculosis outbreaks and ongoing transmission have occurred even afer inmates were screened for TB and have been attributed to failure to complete treatment by inmates known to have LTBI. Id. at page 4. The population of a correctional institution by its nature includes more foreigners, who are more frequent carriers of TB. Infectious disease including TB is always a problem in correctional settings because of close quarters, diverse population, and hygiene issues.

The government suggested through Dr. Pelton that the BOP screens for TB, suggesting that the procedures are adequate to protect Mr. Wallace from TB infection. Screening for infectious disease is not enough though, as demonstrated by example of the recent outbreak of Norovirus at San Quentin. The California Department of Corrections also screens on intake for infectious disease, but still in January 2007, the San Jose Mercury News reported an outbreak of Norovirus at San Quentin, a state prison which screens inmates upon intake. The illness spread within a matter of days to 489 inmates and six staff members, some requiring intravenous hydration. The virus causes diarrhea, vomiting, abdominal cramps, headache, and fever. The virus shout down all movement in and out of San Quentin and required common area of the prison to be cleaned and disinfected. MercuryNews.com "Suspected Virus Closes San Quentin Prison to Visitors and New Inmates," http://mercury news.com/mld/mercurynews/news/local/16377343.htm (dated 1/03/07).

In 1994, the GAO found in a report prepared for a Senate Subcommittee on Health Care in the BOP:

"Tuberculosis is a major problem in correctional facilities because it occurs three times more often than it occurs in the community. To illustrate, outbreaks of tuberculosis have recently occurred in some state prison facilities and some cases have surfaced in BOP correctional facilities. Inmates who had

a positive tuberculosis test and fail to complete the medical treatment risk developing active tuberculosis disease which can be transmitted to other inmates and staff."

Exhibit 11 at page 10, GAO Report on "BOP Inmate Access to Health Care Limited By Lack of Clinical Staff," GAO/HEHS-94-36 BOP (1994).

**D.  Another Factor Supporting A Non-Incarceration Sentence Is that it Would Not Be Cost Effective to Incarcerate Mr. Wallace.**

One relevant consideration for this Court is the cost and efficiency of providing the necessary care.  As Judge Ferguson commented in United States v. Martinez Guerro, 987 F. 2d 618 (9th Cir. 1993): "the proper inquiry under section 5H1.4 calls for a comparison between the efficiency and cost of a full term of incarceration, as opposed to a lesser or alternative sentence, in achieving deterrence, incapacitation, just punishment, and rehabilitation." Id. at 621-622 (J. Ferguson, concurring). "The relevant goal is not imposition of a full term of incarceration; instead the relevant goals to be achieved [by 5H1.4] are framed by 18 U.S.C. § 3553(a). . . ." Id.

Here the government has suggested through Dr. Pelton that cost is not an impediment to Mr. Wallace receiving proper health care, but the evidence suggests otherwise.  First, Dr. Pelton's premise is faulty; he said that the BOP has treated 21 patients in the BOP system receiving Remicade, Enbrel or Humera, some of whom took it for arthritis.  RT 119: 7-9, 132:7.  He wrongly claims that Enbrel is similar to Remicade.  RT 113: 16, 119:12.  Dr. Bochner an expert in this disease testified that "There is no other medication approved by the FDA that is similar to Remicade for the use for Crohn's disease."  RT 70: 5-7.

In his declaration Dr. Pelton said that these patients were treated with "Remicade or similar drugs in the past few years at a cost of about $15,000 per inmate each year."  Pelton Decl. at ¶10.  It is significant that only two people receive

Remicade, a point which shows how uncommon it is for the BOP to authorize this medicine. It is also hard to imagine how the BOP only spends $15,000 per Remicade inmate per year when Dr. Bochner testified the costs associated with a "smooth course of treatment" for Mr. Wallace's therapy (this is before the new hematology treatments are added) is at least $40,000 to $50,000. This estimate is much lower than the proof submitted in the initial filing that his actual medical costs per year are closer to $70,000 to $ 80,000. Either way, the cost of Mr. Wallace's treatment is *many* times greater than Dr. Pelton's example.

The government's suggestion that cost and efficiency of treatment for this extremely ill defendant is not an issue, is belied by a number of important factual findings in the GAO study. Skyrocketing healthcare for an burgeoning prison population serving longer sentences and by a growing number of sicker and older inmates is a huge problem for the BOP. Exhibit 11 at page 9, and Exhibit 12, GAO Report to Subcommittee on Criminal Justice Oversight, Committee on the Judiciary, U.S. Senate "Continuing Health Care Costs for An Increasing Inmate Population," April 6, 2000, GAO/T-GGD-00-112. The study was ordered because of the tremendous rise in BOP health care costs. Id. at page 3.

A number of issues identified in the report have particular significance in this case, as they are exactly the areas where Mr. Wallace's care would require great expenditure and dedication of financial and personnel resources. The GAO attributed skyrocketing costs in part to :

■ to BOP expenditures for pharmaceuticals due to the increasing prevalence of severe illnesses such as HIV and hepatitis. Id. at page 8.

■ noted efforts of the BOP since 1996 to 2000 when the study was conducted to save money in the area of expenditures for "community provider services" and transportation costs associated therewith. Id. at page 7.

■ noted the effective cost saving measure implemented of requiring pre-certification before an inmate is sent to community providers to in patient

hospitalization services or surgery. Id. at page 9. "According to a BOP official. . . the number of trips to outside community provider services [which are the type the Mayo hospital is] were reduced, and the reliance on site BOP medical staff was increased." Id. at 10.

■noted the BOP's pursuit of cost benefit initiatives such as negotiating more advantageous contracts [to pay less to community providers] along the lines of Medicare reimbursement schedules. . . " Id. at 13.

■noted the"BOP's emphasis on generic medicines, and limiting medical personnel from prescribing new, more expensive drugs when the old ones are effective." Id. at 36, citing to the Pharmacy National Formulary Initiative (1992). This is important because the National Formulary does not contain three of the four medicines/narcotics in Mr. Wallace's regimen.

■Noting that the BOP had been able to save money through the "elimination [at some institutions] of 24 hour medical staff. . . a decision within the discretion of each prison warden." Id. at 36.

The standard for what the sentence in this case cannot be whether the BOP can under perfect circumstances treat his severe condition with its patchwork of services, understaffed medical services, and underpaid medical employees. Exhibit 11 at pages 8-9. Dr. Miskovitz opines that this outside contractual arrangement with the Mayo gives him no assurance that Mr. Wallace will be cared for. Exh. 7 at ¶ 9-10.

A deficiency in the access to medical care noted in the 1994 study is particularly applicable to the case at bar.

The Report noted that "Patients with chronic condition that cannot be stabilized often required frequent observation and monitoring by a nurse in a chronic care unit." Id. at 9. The recitation of the closure of the chronic care unit at Lexington in August 1990 particularly resonates in this case, as it exemplifies the opportunities for failure or lack of care that would be devastating for Mr. Wallace. The report explained that:

> "[The Unit] did not have a sufficient number of nurses to staff the unit. As a result, most inmate with chronic care condition, such as high blood pressure, diabetes, and cardiac condition, were housed in units that did not have frequent monitoring by nurses. Thus the institution relied on inmates with chronic conditions to appear at sick call or schedule a clinic appointment themselves when they needed medical care. The physicians try to periodically check when their chronic care patients were last seen. But with little time to see scheduled patients, this check is not a priority and is not always made."

Exhibit 11 at page 9.

This report demonstrates that ten years ago, when the BOP population was 43% of the current population, inmates were receiving deficient health care from the BOP. Exhibit 11, GAO Report on "BOP Inmate Access to Health Care Limited By Lack of Clinical Staff," GAO/HEHS-94-36 BOP (1994). The Report concluded:

> "[c]urrently Bop does not have the capacity to provide appropriate medical and psychiatric care to inmates at the three centers we visited because it has been unable to recruit and retain qualified health care staff. Further staffing shortages at these medical referral centers are chronic and show no signs of improving. This, in turn, adversely affects quality assurance programs, which rely on staff support for effective implementation. In addition, physician assistants, who are relied upon to provide a significant amount of primary care to patients, are not as well trained or supervised as they should be. As a result of these problems patients are and will continue to be at risk of receiving poor care."

Id. at 20.

The BOP strongly disagreed with the conclusions of this Congressional subcommittee study, claiming in a refrain hauntingly familiar to the claim in this case: "[The BOP is providing quality care consistent with community standard with the staff it has at its disposal." Id. at 21. The Subcommittee responded that the BOP

15

conclusion was not justified by the facts. Id. at 21.

In short the government's suggestion that Mr. Wallace will be safe and well taken care of because if he were sentenced and designated to FMC Rochester it is only three miles from the Mayo Hospital. However the documented pressures within the BOP health care system (to reduce its health care expenditures on outside care, on expensive high tech medicines, on reducing sick calls by inmates and spreading its thin services and resources across an ever growing sick and aged population) should further support that it is *not* cost or resource effective to sentence Mr. Wallace to prison. It is evident that house arrest and supervision are much less costly than prison, a proper consideration under U.S.S.G. § 5H1.4.

**E.    The Goals of Punishment Can Be Met By A Sentence of 5 Years Probation With Home Detention and Restitution.**

The goals of punishment can be met without incarceration here, and in a much more efficient and less costly manner.

First, Mr. Wallace is less likely to commit a similar crime as he is no longer able to work in the wine business, has no liquor license, and his reputation is destroyed as his demise and this case was widely publicized. There is no need for incarceration to serve the concept of specific deterrence.

Further, the sanction of lengthy house arrest, along with five years of probation with intensive monitoring and scrutiny of his finances and work will serve the needs of protection of the public. He has no criminal history, these events were years ago, and supervision can adequately protect against any further improper behavior.

Finally the goal of general deterrence will not be ill served by a sentence of probation of five years, and millions of dollars of restitution. His 30 days incarceration in October 2004 have left him with years of pain and suffering and exacerbated his disease. He will never forget that time, nor will he ever be the same. He is still fighting to get his disease under control. For the past year, since April he

has suffered severe anemia from extensive blood loss. He has gone to the hospital or doctors offices on over 100 occasions to get treatment, or blood, or consultation concerning his disease.

A prison term is not necessary to vindicate the law and provide deterrence. On the contrary, a prison sentence here would be cruel and would do noone any good. It would potentially kill him, thereby making sure that noone will get repaid. Instead if he is left at home to do no more than work, be with his family and attend to his dire medical situation, his family, and the victims benefit.

Significant reductions in sentences because of extraordinary health conditions have been made in other cases, and have not depreciated the seriousness of the crimes or respect for the laws of our country.  For instance last year in the Lynne Smith case, the New York attorney convicted of sending communications for the blind Egyptian cleric (Sheik Abdel Rahman), a crime which threatened the security of this country, was not sentenced to 28 months rather than the 30 years in custody sought by the prosecutor in part because she had been diagnosed with breast cancer and in part because of her lifetime of good work as an attorney.   Exhibit 16, news article.

In addition, late last year, a district court in Indianapolis departed from the advisory range of several years to probation in a fraud case involving a woman who deceived young ten couples into paying her $100,000 to adopt Russian babies, using false pictures and false stories, when in fact she had no kids available for the adoptions promised.  Her medical Lupes condition was extraordinary, and it was critical for her to remain under the collaborative care of her team of physicians and health care providers to receive the care she needed.  As in the present case, the BOP would not guarantee Ms. Farnahan a specific designation, and could not show that they had treated anyone with as severe a case as she had.  Exhibit 16.

//

//

## III.
## CONCLUSION

For all of the reasons argued, and based upon the exhibits filed, the testimony taken October 30 and expected February 5, a sentence of home detention with five years probation is fair and adequate to address all appropriate considerations under the relevant sentencing laws.

Dated: January 30, 2007          Respectfully submitted,


By       /s/
   Marilyn E. Bednarski
   Attorney at Law